# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARILYN NISHITANI, CFNP, and ROD
DAKAN, As Co-Personal Representatives of
the Estate of VERA DAKAN, Deceased, and
MARILYN NISHITANI, Individually,

        Plaintiffs,

vs.                                      No. CIV 04-215 JB/WDS

PRESBYTERIAN HEALTHCARE SERVICES,
INC., d/b/a LINCOLN COUNTY MEDICAL
CENTER,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion and Memorandum Brief in Support of Motion to Enforce Settlement Agreement, filed July 2, 2004 (Doc. 7).  The primary issue is whether the Plaintiffs bargained for the specific apology letter that they now demand before signing the final papers and dismissing their lawsuits.  Because the Plaintiffs did not successfully bargain for a specific apology letter, or for the power to rewrite Defendant Presbyterian Healthcare Services, Inc.'s apology letter, the Court will grant PHS' motion and will enforce the settlement agreement.

## FACTUAL BACKGROUND

The Plaintiffs and PHS agree, for the most part, about the facts.  The core issue in this litigation is whether PHS could have done anything to save Vera Dakan's life on May 25, 2003.  The Plaintiffs have sued PHS because it allegedly did not do anything to save Dakan's life and because Dakan, the Plaintiffs' mother, died as a result.  The Plaintiffs have not sued PHS because of the way

PHS treated them in the face of their mother's supposed inevitable death.

The Plaintiffs filed two lawsuits in connection with Dakan's death: (i) this federal case brought under the Emergency Medical Treatment and Active Labor Act; and (ii) a medical malpractice case in New Mexico's Twelfth Judicial District. Both cases are against the same parties and are based on the same allegations.

On the evening of April 22, 2004, Christina Vigil, the Staff Attorney with Presbyterian's Risk Management Division, engaged in settlement negotiations with James P. Lyle, the Plaintiffs' counsel. Those discussions concluded successfully on the morning of April 23, 2004 with a verbal agreement to settle all claims. See Affidavit of Christina Vigil ¶ 10, at 2 (executed July 2, 2004). Among the verbal settlement's terms was an agreement that Presbyterian would not admit liability and would issue a sincere apology letter to the Plaintiffs. See id. ¶ 11, at 2.

Following the conclusion of settlement negotiations, Lyle called Vigil to further request that PHS make some mention in the apology letter that Plaintiff Marilyn Nishitani's care of her mother did not contribute to her mother's outcome. See id. ¶ 12, at 3. As Vigil and Lyle had already reached agreement as to all of the settlement agreement's terms, Lyle's new request was not a settlement term, but merely a request on his client's behalf. See id. Vigil agreed to Lyle's request. See id.

The parties reduced the settlement's terms to a document, and on April 29, 2004, defense counsel delivered an original of the Full Release and Indemnity Agreement ("Agreement") to Lyle. See Letter from Laura Armendariz-Moore to James P. Lyle (April 29, 2004). The parties reached the final form of the Full Release and Indemnity Agreement following a series of drafts exchanged between opposing counsel. See E-mail from James P. Lyle to Scott Gordon and others, plus

preceding e-mail (April 28, 2004).  Lyle did not include any provision regarding an apology letter.

<u>See</u> Vigil Aff. ¶ 13, at 3.

No provision for the apology letter appears in the final, mutually approved Agreement.  <u>See</u>

Agreement.  The Agreement, which does not mention an apology letter, embodies "[a]ll agreements

and understandings between the parties."  Agreement ¶ 8(f), at 6.  The Full Release and Indemnity

Agreement also contains an understanding that PHS denies liability.  <u>See id.</u> ¶ 8(a), at 4.  A June 15,

2004 letter from Lyle to Aaron Viets, counsel for PHS, confirms the parties' understanding that the

apology letter need not contain an admission of liability.  <u>See</u> Letter from James P. Lyle to Aaron C.

Viets (dated June 15, 2004).

On April 29, the next contact between opposing counsel was on May 10, 2004, during a

telephone call in which Lyle indicated that he would await "release" of the apology letter and receipt

of the settlement check.  In that call, Lyle also confirmed that he, and to the extent he had not already

done so on their behalf, his clients, had approved the Full Release and Indemnity Agreement.  PHS

delivered the settlement payment and two stipulations of dismissal to Lyle later that day.  <u>See</u>

Affidavit of Aaron C. Viets ¶ 2, at 1 (executed June 23, 2004).

On June 8, 2004, PHS issued the apology letter.  <u>See</u> Letter from Dr. Gary Jackson to Marilyn

Nishitani and Rod Dakan (June 8, 2004).  On June 14, 2004, Lyle contended in a voice mail message

to PHS' counsel that the June 8th letter was a letter of justification or explanation rather than one of

sincere apology – or words to that effect – and that the parties should probably resume litigation.  <u>See</u>

Viets Aff. ¶ 3, at 1.  On June 15th, Lyle described the June 8th letter as "a patronizing and self serving

letter of excuse, justification, and reaffirmation of the belief [PHS] did nothing wrong."  Letter from

James P. Lyle to Aaron C. Viets (June 15, 2004).  At the same time, he also acknowledged that PHS

was not obligated to admit liability.  See id.

On June 21st, Lyle submitted changes that Plaintiff Rod Dakan proposed and which, in the Plaintiffs' view, would make the June 8th letter acceptable.  See James P. Lyle to Christy Vigil (dated June 21, 2004).  After PHS rejected the Plaintiffs' proposed changes the Plaintiffs told PHS that the Plaintiffs would accept the apology letter if PHS redacted the second paragraph.  PHS refuses to withdraw the objectionable language.

The Plaintiffs are insisting on alterations to the apology letter before performing their end of the settlement agreement bargain.  The Plaintiffs refuse to finalize the settlement and have instead requested specific language that one of the Plaintiffs has drafted.  Specifically, the Plaintiffs state that PHS must excise the second paragraph of Jackson's letter to them before they will stipulate to the dismissal of the two pending lawsuits that followed Dakan's death.

The Plaintiffs have not sent to PHS a signed Full Release and Indemnity Agreement.  The Plaintiffs have also not sent to PHS or to any court the two Stipulations of Dismissal as to the two pending lawsuits.  See Viets Aff. ¶ 4, at 1.

## LAW REGARDING ENFORCEABILITY OF SETTLEMENT AGREEMENTS

A federal court faced with an issue involving the enforceability of a settlement agreement must look to state law.  See United States v. McCall, 235 F.3d 1211, 1215 (10th Cir. 2000)(citing Carr v. Runyan, 89 F.3d 327, 331 (7th Cir. 1996)).  The law in New Mexico encourages settlements.  See McConal Aviation, Inc. v. Commercial Aviation Ins. Co., 110 N.M. 697, 700, 799 P.2d 133, 136 (1990)(expressing that New Mexico's public policy favors settlement in lieu of litigation); Marrujo v. Chavez, 77 N.M. 595, 599, 426 P.2d 199, 201 (1967)(indicating that a party seeking to avoid a settlement has the burden of persuasion).  Verbal settlement agreements are, as a general matter,

enforceable.  See, e.g., Navajo Tribe v. Hanosh Chevrolet-Buick, Inc., 106 N.M. 705, 708, 749 P.2d

90, 93 (1988)(enforcing settlement agreement reached with apparent authority); Gonzales v. Atnip,

102 N.M. 194, 196, 692 P.2d 1343, 1350 (Ct. App. 1984)(observing that an oral settlement

agreement is binding absent fraud or mistake); Bolles v. Smith, 92 N.M. 524, 526, 591 P.2d 278, 280

(1979)(enforcing settlement agreement reached with actual authority).

## ANALYSIS

Against a legal backdrop that fosters settlement, the parties present the Court with a question

of fact: Has PHS fulfilled its obligations or, by not deleting the second paragraph in the proposed

letter, is PHS refusing to comply with the settlement agreement's terms?

When the wording and form of documents are material and essential to a contract or to a

settlement agreement, contracting and settling parties will often attach them to the agreement, and

will make them exhibits to the contract.  Frequently, there will be intense negotiation over such

documents, and drafts are exchanged before there is a settlement.  The parties did not do that here.

Instead, the parties agreed that PHS would send a sincere apology letter, but in the same agreement,

agreed that PHS would not admit liability.  The task for the draftsman was considerable in coming

up with a sincere apology letter that did not admit liability.  If the parties wanted that balance to be

struck a particular way, and such balance was material to the settlement, they could have bargained

over that balance before reaching an agreement over all essential terms..

The final settlement agreement upon which the parties have agreed does not have a

requirement that PHS issue an apology letter.  Nevertheless, the Plaintiffs are now taking the position

that the form of the letter is a material issue.  While the Court believes that the parties agreed on April

23rd to all the essential terms of the settlement agreement, and the settlement included a sincere

apology letter and a denial of liability, there is no indication that the Plaintiffs successfully bargained for or received an agreement about the letter's specific contents, or the power to re-write PHS' letter or to veto it.  Accordingly, while the apology letter is a term of the settlement, and the letter must be sincere, the Plaintiffs have not shown that the specific contents of that letter are otherwise material terms of the agreement.

The Plaintiffs do not and cannot dispute that they did not successfully bargain for drafting or approval power over the apology letter.  They also did not successfully bargain for the right to change the letter's contents. Yet what the Plaintiffs want is an apology for medical treatment, or lack of treatment, that they contend was below the standard of care.  An apology along those lines would come close to being an admission of liability.  The Plaintiffs are thus attempting to insist on rights for which they did not successfully bargain.

The Plaintiffs try to overcome the fact that they did not successfully bargain for the right to change PHS' letter by characterizing the letter as not an apology letter at all.  Assuming, as the Court must, that the settlement agreement requires a sincere apology letter, the question is whether the June 8th letter is a sincere apology letter.  The Court concludes that it is a sincere apology  letter.

 The letter opens with an apology from Dr. Jackson on PHS' behalf.  "I apologize . . . for the difficulties your family encountered when you brought Ms. Dakan into the E.R. on May 25th."  It ends a similar fashion: "Once again, I apologize for the experience you had."  In between, Jackson expresses contrition for the conduct of E.R. staff that night and pledges to learn from the mistakes that were made.  He addresses a point that the Plaintiffs belatedly asked PHS to include in the letter -- in the third paragraph, regarding Nishitani's contention that someone at the hospital that night suggested she was to blame for Daka's condition.

The Plaintiffs contend that the inclusion of the second paragraph transforms the letter from a sincere apology into a reassertion of PHS' claims and defenses. The Plaintiffs argue that, by insisting on including language to this effect, PHS is asking the Plaintiffs to accept a slap in the face, followed by an apology. The Plaintiffs urge the Court to consider how sincere the Court would view such an apology if a murder defendant convicted of killing Dakan before sentencing offered it.

In the second paragraph, Jackson explains that he does not believe that PHS could have done anything to delay Dakan's death. The settlement agreement, however, did not obligate PHS to admit liablity. While the agreement obligated PHS to apologize to the Plaintiffs, and to do so sincerely, it did not obligate PHS to apologize in a particular manner to the Plaintiffs. PHS did what it was obligated to do – apologize sincerely – and thus fulfilled its end of the bargain.

The change that the Plaintiffs demand illustrates that the letter is a sincere apology letter. The Plaintiffs do not explain how deletion of words from Jackson's letter, including the second paragraph, transforms it into a sincere apology letter. The words that apologize in the letter remain the same, regardless which letter is the final letter. The inclusion or deletion of the second paragraph does not greatly change the tone or content of the letter, or detract from the words of apology in the beginning and at the end of the letter.

When the Court reads the letter without the second paragraph, the letter gets close to becoming an admission that Dakan's medical care was substandard. The second paragraph lends background and context that avoids this result. All of the letter's components, including the second paragraph, combine to form a sincere apology for those actions that PHS agrees warrant an apology. PHS is not apologizing for causing Dakan's death, but it did not agree to do so.

It is arguable that the letter would become less sincere by omitting the second paragraph,

which includes Jackson's medical opinion.  Removing the second paragraph makes the letter more like the apology that the Plaintiffs agreed PHS was not obligated to provide.  The Plaintiffs may want a letter that can be interpreted as admitting liability, but they did not bargain for such a letter.  Indeed, they agreed that the PHS was not bound to do that.

PHS has no contractual or other legal obligation to write the letter using the Plaintiffs' terminology.  Moreover, the Plaintiffs' changes come close to requiring an admission of liability, which the Plaintiffs admit was not part of their agreement.  See Letter from Lyle to Viets (June 15, 2004).

Having tendered the settlement check and issued the apology letter, PHS has fully – and perhaps more than fully – performed its end of the bargain.  The Court will enforce the parties' settlement agreement.

**IT IS ORDERED** that the Defendant's Motion to Enforce Settlement Agreement is granted and the settlement agreement is enforced.  The case is dismissed with prejudice.  The Plaintiffs shall sign the Full Release and Indemnity Agreement and the two Stipulations of Dismissals, and deliver them to the Defendant.  The Plaintiffs and their attorney shall abide by all terms of the settlement agreement.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

James P. Lyle
Law Offices of James P. Lyle, P.C.
Albuquerque, New Mexico

   *Attorney for the Plaintiffs*

Scott D. Gordon
Aaron C. Viets
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

   *Attorneys for the Defendant*